[Cite as *State ex rel. Util. Supervisors Emps. Assn. v. Ohio State Emp. Relations Bd.*, 2024-Ohio-5178.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Utilities Supervisors Employees' Association, | : | |
| | : | |
| Relator, | | |
| v. | : | No. 22AP-480 |
| Ohio State Employment Relations Board, | : | (REGULAR CALENDAR) |
| Respondent. | : | |

---

D E C I S I O N

Rendered on October 29, 2024

---

**On brief:** *Gertsburg Licata Co., LPA*, and *Stewart D. Roll*, for relator.

**On brief:** *Dave Yost*, Attorney General, and *Sherry M. Phillips*, for respondent.

---

IN MANDAMUS

MENTEL, P.J.

{¶ 1} Alleging that the City of Cleveland refused to bargain collectively with it as required under R.C. 4117.11(A)(5), relator, Utilities Supervisors Employees' Association, filed an unfair labor practice charge with respondent, State Employment Relations Board ("SERB"). SERB dismissed the charge based on a lack of probable cause. Relator then brought this original action seeking a writ of mandamus ordering SERB to hold a hearing on the matter, find a violation of the statutory right alleged, order collective bargaining, and award damages.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate. The magistrate recommends that we deny relator's request for a writ of mandamus after concluding that the record does not support the

contention that SERB abused its discretion when dismissing relator's charge. The magistrate also recommends overruling relator's May 9, 2023 motion for leave to file a motion to amend the record.

{¶ 3} Relator filed no objection to the magistrate's decision. "If no timely objections are filed, the court may adopt a magistrate's decision, unless it determines that there is an error of law or other defect evident on the face of the magistrate's decision." Civ.R. 53(D)(4)(c). Our review of the magistrate's decision reveals no error of law or other evident defect. *See, e.g.*, *State ex rel. Alleyne v. Indus. Comm.*, 10th Dist. No. 03AP-811, 2004-Ohio-4223 (adopting the magistrate's decision where no objections filed). We agree with the magistrate's conclusion that SERB did not abuse its discretion. Accordingly, we adopt the decision of the magistrate in full, deny relator's motion as moot, and deny relator's request for a writ of mandamus.

*Motion denied*; *writ of mandamus denied*.

LUPER SCHUSTER and BEATTY BLUNT, JJ., concur.

_____

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel. Utilities Supervisors          :
Employees' Association,
                                             :
              Relator,
                                             :
v.                                                               No.  22AP-480
                                             :
Ohio State Employment Relations Board,                     (REGULAR CALENDAR)
                                             :
              Respondent.
                                             :

                                             :

---

M A G I S T R A T E ' S   D E C I S I O N

Rendered on August 6, 2024

---

*Gertsburg Licata Co., LPA*, and *Stewart D. Roll*, for relator.

*Dave Yost*, Attorney General, and *Sherry M. Phillips*, for respondent.

---

IN MANDAMUS

**{¶ 4}**  Relator Utilities Supervisors Employees' Association ("the Association") filed before respondent State Employment Relations Board ("SERB") an unfair labor practice charge against the City of Cleveland ("the City"). The Association alleged the City refused to bargain collectively within the meaning of R.C. 4117.11(A)(5). SERB issued a decision dismissing the charge with prejudice for lack of a probable cause to believe the City had failed to negotiate in good faith. Now, the Association requests the issuance of a writ of mandamus ordering SERB to: (1) hold a hearing, (2) find the City violated R.C. 4117.11, (3) order the City to bargain collectively with the Association on the topic of wages, and (4) grant damages to the Association on the basis of the City's alleged refusal to bargain.

## I. Findings of Fact

{¶ 5} 1. The City is a public employer, as defined in R.C. 4117.01(B).

{¶ 6} 2. The Association is an employee organization, as defined in R.C. 4117.01(D).

{¶ 7} 3. The City and the International Union of Operating Engineers, Local 10 ("Local 10"), entered into a collective bargaining agreement effective April 1, 2019 through March 31, 2022 ("the CBA"). (Stip. at 98.) Under the terms of the CBA, Local 10 was recognized as the sole and exclusive representative for the bargaining unit, which consisted of employees of the City serving in certain specified full-time supervisory classifications.

{¶ 8} 4. Following a representation election, the Association replaced Local 10 as the exclusive representative of the bargaining unit in June 2021. Since that time, the City and the Association continued to operate under the terms of the CBA in effect between the City and Local 10, even after CBA expired on March 31, 2022.

{¶ 9} 5. On January 21, 2022, the Association filed with SERB a notice to negotiate. Beginning on January 24, 2022, the Association began contacting the City to schedule negotiations. On January 24, 2022, a representative of the City confirmed receipt of the notice to negotiate. On January 31, 2022, the City informed the Association of the identity of its lead negotiator.

{¶ 10} 6. In January 2022, there was a change in the City's administration after the City's new mayor took office. In response to the Association's attempts to schedule negotiations, the City's lead negotiator explained that there would be a delay in the City's commencement of negotiations. On February 1, 2022, the lead negotiator sent the Association an email stating: "We are in the process of developing initial proposals with the new Administration. This may take a few weeks before things are brought up to speed." (Stip. at 10, 64.) The lead negotiator also explained that he was involved in another series of negotiations with a different party and was attempting to resolve that matter before focusing on the City's negotiations.

{¶ 11} 7. On March 9, 2022, the Association filed an unfair labor practice charge against the City, alleging that the City's failure to provide dates for the commencement of negotiations constituted a refusal to bargain collectively in violation of R.C. 4117.11(A)(5).

{¶ 12} 8. On March 9, 2022, the City's lead negotiator emailed the Association explaining that he had had "multiple conversations" with the Association's counsel explaining the "multiple factors that impeded the City's efforts at this time to commence negotiations at the pace you desire, along with many other bargaining units who are in the same situation." (Stip. at 212-13.) The lead negotiator detailed the factors as follows:

> The City has experienced a change in leadership for the first time in 16 years, with a new Mayor and senior administrative leadership. Naturally, this change comes with a possible modification in how to conduct negotiations from both a procedural and substantive perspective. The uncertainty until late last year regarding who would become Mayor, along with the equal uncertainty until early this year regarding who would be appointed to senior administrative positions, delayed the usual efforts to prepare for negotiations months in advance of the March 31 contract expiration dates. As I explained when we first discussed scheduling negotiations almost immediately after the filing/service of the Notice to Negotiate, those preparation efforts had not yet started because the new senior administrators were just beginning to assume their responsibilities. In addition, the City was still attempting to fill the critical Manager of Labor Relations position, which had been vacant for several months. That new person began working two days ago.

> Because of the uncertainty in leadership, our firm did not know whether we would continue to represent the City as outside labor counsel. This obviously impeded any efforts by our firm to prepare for negotiations any time last year. Indeed, we did not know until shortly before the filing/service of the Notice to Negotiate that we would continue in that role. Upon receiving that confirmation, we began immediately to assist the City with negotiations preparation.

> The delays in securing senior leadership also delayed the appointment of the members of the City's negotiations teams — not only for the USEA negotiations, but for more than 30 other sets of negotiations. Although you expressed an eagerness in scheduling dates, even if they were weeks in advance, we also discussed how unproductive it would be to schedule dates and then have to cancel them because the bargaining team had not been appointed or was not fully prepared to participate.

(Stip. at 213-14.) Based on these factors and "the enormity of the City's bargaining responsibilities," the lead negotiator argued that the pace of the City's efforts to prepare

for and commence negotiations was reasonable. (Stip. at 181.) The lead negotiator stated that he had consulted with the City to begin scheduling dates for negotiations and offered seven dates and times to conduct an initial bargaining session.

{¶ 13} 9. On April 4, 2022, the Association and City met and commenced negotiations. The Association presented its wage proposal, and the City presented its initial proposals, which did not include a proposal on wages. According to the City, the delay in presenting a wage proposal was due to the fact that "City Council had recently passed the budget and it would take the City additional time to calculate the wage proposals." (Stip. at 182.) After the City did not present a wage proposal, the negotiations were concluded with an agreement to continue negotiations on April 21, 2022.

{¶ 14} 10. Following the April 4, 2022 meeting, the lead negotiator for the City emailed the Association seeking to "confirm" that the Association was going to "withdraw its unfair labor practice charge against the City without the need for the parties to submit position statements." (Stip. at 207.) The Association responded that it would not withdraw the unfair labor practice charge, stating that it "hope[d] the next meeting on April 21, 2022, will include a productive conversation on wages." (Stip. at 206.) The City's lead negotiator defended its position in an April 12, 2022 email to the Association, stating:

> While the Union can continue to maintain the charge, the City firmly believes that the charge lacks merit. Negotiations have commenced; we have conducted one bargaining session; and we have another scheduled. The City's timetable for presenting its wage proposal to this Union and every other bargaining representative for its 32 bargaining agreements no more constitutes bad faith bargaining than the Union's apparent delay in completing its initial proposals presentation during our initial bargaining session. My recollection is that the Union presented only a written wage proposal and an oral uniform/clothing/maintenance allowance proposal (which Oliver followed up with written details). The City then presented its complete initial proposals, which included a reservation on wages and discipline procedures. The Union then requested a caucus to discuss the remainder of its initial proposals in light of the City's initial proposals. When the bargaining session resumed, the Union concluded the proceedings without presenting any further proposals. The City does not intend to file a charge over the Union's actions, which are substantively similar to the City's actions.

(Stip. at 203.)

{¶ 15} 11. On April 21, 2022, the parties met for their second negotiation session.

{¶ 16} 12. On April 22, 2022, the Association filed an amended unfair labor practice charge based on the alleged failure of the City at the April 4 and April 22, 2022 negotiation sessions to negotiate wages and uniform reimbursement costs in response to the Association's proposals on the same topics. The Association further stated that the City's "excuse for not negotiating on April 4, 2022, was that [the City's] new administration had not yet determined how much money it could devote toward employee wages and uniform reimbursement costs." (Stip. at 108.) According to the Association, the City did not negotiate on April 21, 2022 because it "first wanted to negotiate with larger Cleveland unions and the police union so that it could establish a 'pattern' which the smaller unions would have to follow." *Id.* The Association asserted that these actions constituted a violation of R.C. 4117.11(A)(5).

{¶ 17} 13. The Association's unfair labor practice charge was investigated by a SERB labor relations specialist.

{¶ 18} 14. In response to a request for information by the investigator, the City provided a position statement that included a factual summary. According to the City, the Association "only wanted to discuss the wage proposal and uniform reimbursement costs," but the City informed the Association that the City "was not prepared to discuss the wage proposal at that time and indicated that the City wanted to negotiate the non-economic terms." (Stip. at 184.) According to the City, the Association "refused to continue the negotiations and offer any reasonable alternatives to the numerous pending bargaining items between the City and Union for their initial collective bargaining agreement." *Id.* Furthermore, the City stated that the Association "refused to meet again until SERB ruled on its ULP charge against the City; refused to provide the City with the remainder of the Union's initial proposals; and refused to negotiate the non-economic proposals." *Id.* The City stated that shortly after the second negotiation session began, it concluded due to the Association's position that "it would not continue to bargain without the City first negotiating wages." *Id.*

{¶ 19} The City argued that it "presented its initial proposals to the [Association] and requested to continue negotiations while the economic wage proposal was temporarily on hold." (Stip. at 186.) The City argued that the Association had: "(1) refused

to provide the City with its initial proposals, (2) [refused to] provide counterproposals to the City's numerous initial proposals, (3) left the negotiations prematurely after learning the City did not have its economic proposal, and (4) refused to schedule any further negotiation with the City until the City provided a wage proposal to the Union." *Id.*

{¶ 20} With regard to the Association's allegations of pattern bargaining, the City stated that it did not engage in pattern bargaining with the Association. In support of this, the City stated:

> All of the contracts between the City and its 32 Unions expire at the same time and the City has not even started negotiations with all of its unions. No pattern has been set with any Union. No decision has been made to wages with any Union.
>
> * * *
>
> The City is in its infancy with negotiations with every other bargaining unit (approximately 31). To date, the City has not met or even exchanged initial proposals with a large number of its unions, including its largest Union, AFSCME Local 100. In regards to the bargaining units it has met with, all of the City's initial proposals contained an economic hold in each and every one. The City did not treat [the Association] less than compared to any other Union. Recently, the City has presented a wage proposal to a few bargaining units and it was only after a few rounds of bargaining sessions. Again, [the Association] and the City had two bargaining sessions, with the last one taking place on April 21, 2022, which combined lasted less than a few hours. Had [the Association] engaged in negotiations and participated in give and take instead of refusing to further negotiate until SERB had issued a ruling on its charge, the parties would have most likely continued to meet and the City would have been able to provide its wage proposal.

(Stip. at 188-89.)

{¶ 21} 15. The SERB labor relations specialist issued an investigator's memorandum on July 21, 2022. The labor relations specialist made the following findings:

> Information gathered during the investigation reveals that the parties are in negotiations for a successor agreement However, the [Association] asserts that the [City] is negotiating in bad faith because [the City] did not submit wage proposals during the first two bargaining sessions

> between the parties. The [City] has rebutted this allegation by providing information regarding the reasons it has yet to submit proposals for wages. These reasons include a change in the City's Mayor, the appointment of a new Labor Relations Director, and other economic considerations created by these changes. The parties are still engaged in contentious negotiations and are working with the prior contract in effect as negotiations move forward. Based on the information provided, the [City's] actions do not rise to the level of an (A)(5) statutory violation.

(Stip. at 230-31.) Based on the findings in the investigation, the labor relations specialist recommended that SERB "dismiss the charge with prejudice for lack of probable cause to believe that an unfair labor practice has been committed by Charged Party." (Stip. at 231.)

{¶ 22} 16. On July 21, 2022, SERB dismissed the Association's unfair labor practice charge, making the following findings:

> Pursuant to Ohio Revised Code § 4117.12, the State Employment Relations Board conducted an investigation of this charge. The investigation revealed no probable cause existed to believe [the City] violated Ohio Revised Code § 4117.11. Information gathered during the investigation revealed that the parties are in negotiations for a successor agreement. The [Association] believes that because the [City] has not submitted wage proposals at the first two bargaining sessions they are negotiating in bad faith. The [City] provided compelling information that show the reasons it has yet to submit wage proposals, which include, a change in the Mayor, a new Labor Relations Director, and other economic issues that have been affected by these changes. The parties are engaged in contentious negotiations and are working under the prior contract as negotiations move forward. Based on the information provided, the [City's] actions do not rise to the level of an (A)(5) violation of the statute. Accordingly, the charge is dismissed with prejudice for lack of probable cause to believe the statute has been violated.

(Stip. at 232.)

{¶ 23} 17. On August 5, 2022, the Association commenced this mandamus action by filing its complaint. The Association also filed an application for an alternative writ of mandamus.

{¶ 24} 18. On August 15, 2022, SERB filed a memorandum in opposition to the application for an alternative writ. On September 7, 2022, SERB filed a motion to dismiss.

{¶ 25} 19. On September 7, 2022, the Association filed an amended complaint and amended application for alternative writ of mandamus. In the amended application for alternative writ of mandamus, the Association sought an alternative writ ordering SERB to hold a hearing on the unfair labor practice charge, find that the City violated R.C. 4117.11, and order the City to bargain collectively with the Association. In the alternative, the Association sought an order requiring the City to file and serve its verified return.

{¶ 26} 20. On September 15, 2022, a magistrate's order was issued denying as moot SERB's motion to dismiss based on the filing of the amended complaint.

{¶ 27} 21. On September 26, 2022, SERB filed its answer to the amended complaint.

{¶ 28} 22. On October 26, 2022, a magistrate's order was issued finding that because SERB had filed an answer to the amended complaint and an order setting forth a schedule for the submission of evidence and briefs had already been issued, the Association's amended application for an alternative writ of mandamus was moot. The magistrate found that because material facts were in dispute, it did not appear beyond doubt at that time that the Association was entitled to the requested extraordinary relief. As a result, the magistrate concluded no other relief was appropriate at that time.

{¶ 29} 23. On May 9, 2023, the Association filed a motion for leave to file motion for an order which allows amendment of the record.

{¶ 30} 24. On June 26, 2023, counsel for the Association filed a motion to withdraw as counsel of record, stating that it was the understanding of counsel that the Association was in the process of retaining new counsel. Counsel further stated that the Association had been notified that its presence was required at any subsequent hearing dates.

{¶ 31} 25. On July 13, 2023, a magistrate's order was issued granting the June 26, 2023 motion to withdraw.

{¶ 32} 26. On May 29, 2024, a magistrate's order was issued noting that service of the July 13, 2023 magistrate's order appeared to have failed and that substitute counsel for the Association had not filed a notice of appearance. Because of the Association's status as entity not capable of proceeding pro se, substitute counsel was required to file a

notice of appearance within 30 days. No such notice has been filed as of the date of this decision.

## II. Discussion and Conclusions of Law

{¶ 33} The Association seeks extraordinary relief in mandamus, asserting that SERB erred in finding no probable cause existed to believe the City committed an unfair labor practice.

### A. Mandamus

{¶ 34} A writ of mandamus is an extraordinary remedy " 'issued in the name of the state to an inferior tribunal, a corporation, board, or person, commanding the performance of an act which the law specifically enjoins as a duty.' " *State ex rel. Russell v. Klatt*, 159 Ohio St.3d 357, 2020-Ohio-875, ¶ 7, quoting R.C. 2731.01. *See State ex rel. Blachere v. Tyack*, 10th Dist. No. 22AP-478, 2023-Ohio-781, ¶ 13 (stating that the purpose of mandamus is to compel the performance of an act that the law specifically enjoins as a duty resulting from an office, trust, or station). In order for a writ of mandamus to issue here, the Association must establish by clear and convincing evidence: (1) a clear legal right to the requested relief, (2) a clear legal duty on the part of the SERB to provide it, and (3) the lack of an adequate remedy in the ordinary course of the law. *State ex rel. Gil-Llamas v. Hardin*, 164 Ohio St.3d 364, 2021-Ohio-1508, ¶ 19. " 'Clear and convincing evidence' is a measure or degree of proof that is more than a preponderance of the evidence but less than the beyond-a-reasonable-doubt standard required in a criminal case; clear and convincing evidence produces in the trier of fact's mind a firm belief of the fact sought to be established." *State ex rel. Ware v. Crawford*, 167 Ohio St.3d 453, 2022-Ohio-295, ¶ 14, citing *State ex rel. Miller v. Ohio State Hwy. Patrol*, 136 Ohio St.3d 350, 2013-Ohio-3720, ¶ 14.

### B. Unfair Labor Practices under the Ohio Public Employees Collective Bargaining Act

{¶ 35} Prior to the enactment of the Ohio Public Employees Collective Bargaining Act ("the Act"), which is codified in R.C. Chapter 4117, "Ohio had no legal framework governing public-sector labor relations, and dealt with these issues on an *ad hoc* basis." *State ex rel. Dayton Fraternal Order of Police Lodge No. 44 v. State Emp. Relations Bd.*, 22 Ohio St.3d 1, 5 (1986). Without this legal framework, public employees had no

constitutional or statutory right to collectively bargain or strike. *Franklin Cty. Law Enforcement Assn. v. Fraternal Order of Police, Capital City Lodge No. 9*, 59 Ohio St.3d 167, 169 (1991). The Act's enactment in 1984 "established a comprehensive framework for the resolution of public-sector labor disputes by creating a series of new rights and setting forth specific procedures and remedies for the vindication of those rights." *Id*. The purpose of the Act was to "minimize public-sector labor conflict and to provide a mechanism for resolving disputes when they arise." *Dayton Fraternal Order of Police* at 6. In furtherance of the Act's purpose, SERB was created as an agency of the state of Ohio with the charge of administering the Ohio Public Employees Collective Bargaining Act. *State ex rel. Brecksville Edn. Assn. v. State Emp. Relations Bd.*, 74 Ohio St.3d 665, 666 (1996); R.C. 4117.02. The Act recognizes that public employers and employees, including employee organizations, have a right to be free from unfair labor practices, as such practices are defined in R.C. 4117.11. *Franklin Cty. Law Enforcement Assn.* at 169.

{¶ 36} SERB possesses "exclusive jurisdiction to determine the validity, or lack thereof, of unfair labor practices." *City of E. Cleveland v. E. Cleveland Firefighters Local 500, I.A.F.F.*, 70 Ohio St.3d 125, 127 (1994). *See* R.C. 4117.12(A); *Franklin Cty. Law Enforcement Assn.* at 170 ("SERB has exclusive jurisdiction to decide matters committed to it pursuant to R.C. Chapter 4117."); *State ex rel. Cleveland v. Sutula*, 127 Ohio St.3d 131, 2010-Ohio-5039, ¶ 20. R.C. 4117.12(B) governs the process employed by SERB to determine the validity of unfair labor practice charges, providing as follows: "When anyone files a charge with [SERB] alleging that an unfair labor practice has been committed, [SERB] or its designated agent shall investigate the charge. If [SERB] has probable cause for believing that a violation has occurred, [SERB] shall issue a complaint and shall conduct a hearing concerning the charge."

{¶ 37} Because probable cause is not defined in R.C. Chapter 4117, the Supreme Court of Ohio has found that it must be accorded its ordinary meaning. *State ex rel. Portage Lakes Edn. Assn. v. State Emp. Relations Bd.*, 95 Ohio St.3d 533, 2002-Ohio-2839, ¶ 37. Thus, "SERB must issue a complaint and conduct a hearing on an unfair labor practice charge if, following an investigation, it has a reasonable ground to believe that an unfair labor practice has occurred." *Id*. at ¶ 38. *See State ex rel. Teamsters Local Union No. 284 v. State Emp. Relations Bd.*, 10th Dist. No. 20AP-307, 2021-Ohio-3318, ¶ 14. "In

making its determination, SERB will consider not only the evidence that supports the allegations of the charge but also, of course, any information that may rebut the charge or offer a defense to the violation alleged. Issues such as managerial justification, the absence of protected activity by a charging party, or the failure to show any indication of unlawful motivation may be sufficient to secure dismissal of a case even when the facts alleged in the charge have been verified." (Citation and quotation omitted.) *Portage Lakes* at ¶ 40. In this way, the court likened SERB's probable cause determination to that of a prosecutor investigating a citizen's complaint of criminal activity. *Id.* at ¶ 39-40. The charging party bears the initial burden of demonstrating that an unfair labor practice has occurred. *State ex rel. Fuller v. State Emp. Relations Bd.*, 193 Ohio App.3d 272, 2011-Ohio-1599, ¶ 28 (10th Dist.).

{¶ 38} Mandamus is the appropriate action to challenge SERB's dismissal of an unfair labor practice charge for lack of probable cause. *State ex rel. Serv. Emp. Internatl. Union, Dist. 925 v. State Emp. Relations Bd.*, 81 Ohio St.3d 173 (1998), paragraph one of the syllabus. *See Ohio Assn. of Pub. School Emp., Chapter 643, AFSCME/AFL-CIO v. Dayton City School Dist. Bd. of Edn.*, 59 Ohio St.3d 159, 161 (1991) (stating that "a decision by SERB whether or not to issue a complaint in an unfair labor practice case is not reviewable pursuant to R.C. Chapter 119 or R.C. 4117.02(M) and 4117.13(D)"). The Supreme Court of Ohio has held that "SERB is under a clear legal duty to issue a complaint concerning an unfair labor practice charge when SERB's investigation of that charge reveals the existence of probable cause to believe that an unfair labor practice has been committed." *Serv. Emp.*, 81 Ohio St.3d at 179. *See State ex rel. Hall v. State Emp. Relations Bd.*, 122 Ohio St.3d 528, 2009-Ohio-3603, ¶ 19 (stating that "[t]his determination is generally factual, and courts cannot substitute their judgment for that of SERB if there is conflicting evidence").

{¶ 39} A court reviews SERB's determination to dismiss an unfair labor practice charge for an abuse of discretion. *State ex rel. Leigh v. State Emp. Relations Bd.*, 76 Ohio St.3d 143, 145 (1996); *State ex rel. Professionals Guild v. State Emp. Relations Bd.*, 10th Dist. No. 08AP-417, 2009-Ohio-2155, ¶ 12 (stating that in considering the evidence "the question before us is not whether we disagree with SERB's determination that probable cause did not exist, but whether SERB abused its discretion in so concluding"). "An abuse

of discretion occurs when a decision is unreasonable, arbitrary, or unconscionable." *State ex rel. Stiles v. School Emps. Retirement Sys.*, 102 Ohio St.3d 156, 2004-Ohio-2140, ¶ 13. *See Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, ¶ 39.

## C. Whether SERB Abused its Discretion by Dismissing the Unfair Labor Practice Charge Against the City

{¶ 40} Before addressing the merits of this matter, it is necessary to resolve the Association's May 9, 2023 motion for leave to file motion for an order which allows amendment of the record. In its memorandum in support of the motion, the Association states that it seeks to add evidence to the record reflecting events that occurred after SERB issued its decision dismissing the unfair labor practice charge. "It is axiomatic that SERB could not abuse its discretion based on evidence that was not properly before the board when it made its decision. Consequently, the review of a SERB decision is generally limited to the facts as they existed at the time SERB made its decision." *Portage Lakes*, 2002-Ohio-2839, at ¶ 55. *See State ex rel. Hamilton Cty. Bd. of Commrs. v. State Emp. Relations Bd.*, 102 Ohio St.3d 344, 2004-Ohio-3122, ¶ 21; *Davis v. State Emp. Relations Bd.*, 10th Dist. No. 13AP-40, 2013-Ohio-3545, ¶ 12; *Hall* at ¶ 37. Because SERB's May 9, 2023 motion seeks to add matters to the record that were not before SERB at the time it made its probable cause determination, this motion must be denied.

{¶ 41} At issue in this matter is whether SERB abused its discretion by dismissing the Association's unfair labor practice charge for lack of probable cause. The Association asserted in its unfair labor practice charge that the City violated R.C. 4117.11(A)(5). This statute provides it is an unfair labor practice for a public employer, including its agents or representatives, to "[r]efuse to bargain collectively with the representative of his employees recognized as the exclusive representative or certified pursuant to [R.C. Chapter 4117]." R.C. 4117.11(A)(5).

{¶ 42} The Association argues the City committed a violation of R.C. 4117.11(A)(5) by engaging in surface bargaining, a form of bad-faith bargaining. "The absence or presence of good-faith bargaining is determined objectively based on a consideration of the totality of the circumstances." *State ex rel. Mun. Constr. Equip. Operators' Labor Council v. Ohio State Emp. Relations Bd.*, 10th Dist. No. 15AP-471, 2017-Ohio-2624, ¶ 19, citing *Akron v. State Emp. Relations Bd.*, 9th Dist. No. 26227, 2013-Ohio-1213, ¶ 7. "The

circumvention of the duty to bargain is unlawful, regardless of subjective good faith." *Mun. Constr.* at ¶ 19. " 'In applying the totality of the circumstances test, permissible "hard bargaining" is distinguishable from bargaining in bad faith.' " *Id.*, quoting *Akron* at ¶ 7, citing *Twinsburg City School Dist. Bd. v. State Emp. Relations Bd.*, 172 Ohio App.3d 535, 2007-Ohio-957, ¶ 16 (9th Dist.). In *Akron*, the court explained distinguishing permissible hard bargaining from impermissible surface bargaining as follows:

> In the private sector, when a party is found to have used negotiation techniques to frustrate or avoid mutual agreement, that party is said to have engaged in "surface bargaining." A party is alleged to have engaged in surface bargaining based upon the totality of its conduct at or away from the bargaining table, since an intent to frustrate an agreement is rarely articulated. "More than in most areas of labor law, distinguishing hard bargaining from surface bargaining calls for sifting a complex array of facts, which taken in isolation may often be ambiguous." "[I]f the Board is not to be blinded by empty talk and by the mere surface motions of collective bargaining, it must take some cognizance of the reasonableness of the positions taken by an employer in the course of bargaining negotiations." Although an employer may be willing to meet at length and confer with the union, the employer has refused to bargain in good faith if it merely goes through the "motions" of bargaining, such as where an employer offers a proposal that cannot be accepted, along with an inflexible attitude on major issues and no proposal of reasonable alternatives.

*Akron* at ¶ 7, quoting *In re Springfield Local School Dist. Bd. of Edn.*, SERB No. 97-007, 1997 WL 34638264, *7 (Feb. 6, 1997).

{¶ 43} The Association argues the City's failure to present a wage proposal and alleged plan to engage in pattern bargaining constituted bad-faith surface bargaining. Pattern bargaining has been described as a negotiation method in which an employer first reaches an agreement on terms and conditions with one of its unions that it then seeks to apply as a pattern or standard in its negotiations with other unions. *See Globe Newspaper Co. v. Internatl. Assn. of Machinists, Local 264*, 648 F.Supp.2d 193, 195 (D.Mass.2009), fn. 3 ("The Globe has typically engaged in 'pattern bargaining' with its various unions. Under this negotiation method, the Globe reaches a lead wage settlement with one of the larger unions and then follows the 'pattern' from that settlement with each of the other unions."). Alternatively, this method has been employed by unions through securing an

agreement with a particular employer in order to set terms of collective bargaining agreements across an entire industry. *See KSW Mechanical Servs. v. Mechanical Contrs. Assn. of New York*, S.D.N.Y. No. 11 Civ. 5100, 2012 U.S. Dist. LEXIS 42248, at *8-9 (Mar. 27, 2012) ("In typical pattern bargaining, a union reaches an agreement with an employer that sets the pattern for the entire industry. Subsequently, other companies agree to the same provisions as a means of equalizing labor costs. Pattern bargaining results in the same wages, benefits, and working conditions for all employees in an industry.").

{¶ 44} In support of its allegations of pattern bargaining, the Association points to evidence outside the record.[1] There is no indication the information alleged by the Association was before SERB when it reached its decision dismissing the Association's unfair labor practice charge. As a result, the Association's statements made in reliance on evidence outside the record are disregarded. *See Portage Lakes*, 2002-Ohio-2839, at ¶ 55.

{¶ 45} In another unfair labor practice case involving the City, SERB considered circumstances resembling pattern bargaining in determining whether the City had engaged in surface bargaining. *In re Cleveland*, SERB No. 2004-004, 2004 OH SERB LEXIS 28 (Aug. 9, 2004). In *Cleveland*, before the initial negotiation session between the City and a union, the City sent, as its initial proposal, a copy of the collective bargaining agreement it had recently reached with another union. At the negotiation session, the City's representative explained that the City did not want to enter into an agreement with the union that differed substantially from the terms it had reached with its other unions. The City also stated that "it could not offer different benefits to the Union." *Id*. at *5. Because of the City's demands that the union accept its wage proposal, the union asked the City to set aside the issue of wages and move forward to negotiate the remaining items of concern that the City had reviewed with the union. The City refused, taking the position that it would not discuss anything further until the union moved off its wage proposal.

{¶ 46} SERB found in that case that the City engaged in bad-faith bargaining during its negotiation session in violation of R.C. 4117.11(A)(1) and (A)(5). SERB stated that "[d]espite its protestations that it was not refusing to bargain, the City's conduct at

---

[1] *See* Association's Reply Brief at 3-7 (citing a news article regarding an alleged collective bargaining agreement between another union and the City).

the June 13, 2003 meeting can only be described as 'surface bargaining' " because the City "refused to engage with the Union in any give-and-take whatsoever." *Id.* at *10. The City's refusal to "make any counterproposals to the Union's opening counterproposal" indicated that although the City was "willing to 'meet and confer' with the Union," it was "not willing to propose any reasonable alternatives." *Id.* at *10-11. SERB also cited the City's termination of the negotiation session after rejecting the union's suggestion to table the issue of wages and move to negotiate other items as an example of the City's "inflexible attitude" that constituted bad-faith surface bargaining. *Id.* at ¶ 11.

{¶ 47} In this case, multiple factors support finding SERB did not abuse its discretion by determining there was not probable cause to support the charged violation of R.C. 4117.11(A)(5). First, the Association points to no authority directly holding that pattern bargaining constitutes a per se violation of R.C. 4117.11(A)(5). Although SERB addressed circumstances that could constitute pattern bargaining in *Cleveland*, SERB did not hold that pattern bargaining *alone* rendered the City's actions in that case a violation of the statutory duty to bargain collectively.

{¶ 48} Next, the totality of the facts and circumstances of this case do not support finding SERB abused its discretion. Here, unlike the circumstances resembling pattern bargaining in *Cleveland*, the City did not state that it would only offer the same benefits to the Association that it had agreed to with another union. Indeed, at the time the Association brought its unfair labor practice charge, there is no evidence that the City had agreed to terms and conditions with one of the other unions with which it was negotiating. Moreover, unlike in *Cleveland* and *Akron*, there is no evidence in this case demonstrating that the City refused to engage with the Association in any give-and-take. The City did not offer "a proposal that cannot be accepted, along with an inflexible attitude on major issues and no proposal of reasonable alternatives." *Akron* at ¶ 7. Instead, the City presented justifications for its delay in commencing negotiations and presenting a wage proposal. The City also attempted to negotiate other proposals while it prepared to negotiate wages. On the other hand, there existed evidence that the Association failed or refused to present proposals on other topics or counterproposals to those offered by the City on nonwage-related matters.

**{¶ 49}** Additionally, among other particular facts and circumstances separating this matter from that in *Cleveland*, the timing of negotiations coincided with a change in the City's administration, including the mayor and labor relations director, and the conclusion of the City's budgeting process. The Association does not point to cases demonstrating the delay in commencing negotiations or presenting a wage proposal, especially when considered in light of the City's proffered explanations and expressed willingness to negotiate on other proposals, constituted a refusal to bargain within the meaning of R.C. 4117.11(A)(5). Finally, unlike in *Cleveland*, the City did not walk away from or close the negotiations—the Association did.

**{¶ 50}** In support of its arguments, the Association cites to *In re Rootstown Local School Dist. Bd. of Edn.*, SERB No. 2011-004, 2011 OH SERB LEXIS 25 (July 7, 2011).[2] (Association's Brief at 7.) In *Rootstown*, the union alleged that the public employer engaged in bad-faith bargaining in violation of R.C. 4117.11(A)(1) and (A)(5) by failing to maintain the status quo ante during negotiations for a successor collective bargaining agreement with the union. SERB found that good-faith bargaining was determined by looking to the totality of the circumstances. SERB found the employer violated R.C. 4117.11(A)(5) when it unilaterally instituted a wage and step freeze during negotiations prior to exhausting the dispute resolution procedure for a successor agreement. Yet, under the totality of the circumstances, SERB concluded that the employer's actions did not interfere with, restrain, or coerce bargaining-unit employees in the exercise of their rights in violation of R.C. 4117.11(A)(1).

**{¶ 51}** Other than the allegation of a violation of R.C. 4117.11(A)(5), *Rootstown* presents an entirely different set of factual circumstances from those present in this matter. It is undisputed that the City and the Association continued to operate under the terms of the prior CBA during negotiations. *Rootstown* does not support finding SERB

---

[2] Other case citations appear in the Association's table of contents in its merit brief. However, the Association does not specifically cite these cases in its arguments. Nor does the Association explain how these cases apply to this matter. It is unclear as to whether the Association intended to cite these cases or whether their inclusion in the table of contents was mere typographical error. Some evidence supports finding these to be a typographical error, as the table of contents lists pages that do not appear in the Association's brief. The Association bears the burden of demonstrating entitlement to a writ of mandamus. *Mun. Constr.*, 2017-Ohio-2624, at ¶ 5. Due to the absence of any indication of how these cases support the Association's arguments, the magistrate disregards the citations appearing only in the Association's table of contents in its merit brief.

committed an abuse of discretion in dismissing the Association's unfair labor practice charge.

{¶ 52} Considering the totality of facts and circumstances in the record, the Association has not demonstrated SERB abused its discretion by failing to find the City was bargaining in bad faith or refusing to bargain. The record does not support finding SERB abused its discretion by failing to conclude that the City was engaging in surface bargaining or improper pattern bargaining. As a result, the Association has not shown SERB erred by dismissing the Association's unfair labor practice charge for lack of probable cause.

## D. Conclusion

{¶ 53} Based on the foregoing, the Association has not established a clear legal right to the requested relief or that SERB was under a clear legal duty to provide it. Accordingly, it is the decision and recommendation of the magistrate that the Association's request for a writ of mandamus should be denied. Furthermore, the magistrate recommends denying the Association's May 9, 2023 motion for leave to file motion for an order which allows amendment of the record.

/S/ MAGISTRATE
JOSEPH E. WENGER IV

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b). A party may file written objections to the magistrate's decision within fourteen days of the filing of the decision.